**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Carissa Perry, | No. CV-25-01552-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Exeter Finance LLC, et al., | |
| Defendants. | |

Carissa Perry ("Plaintiff"), who is proceeding *pro se*, alleges that Exeter Finance LLC ("Exeter") and Cobra Equity Holdco LLC ("Cobra") (together, "Defendants") engaged in "a calculated scheme of financial misconduct" following the repossession of her car "that culminated in the issuance of a fraudulent Form 1099-C, unlawful credit reporting, and sustained economic retaliation—all following [Plaintiff's] full performance under a binding settlement agreement." (Doc. 9 at 1.)  In her 90-page complaint, Plaintiff asserts 18 causes of action under federal and state law.  Defendants have, in turn, moved to compel arbitration. (Doc. 19.)  For the reasons that follow, the motion is granted.

**BACKGROUND**

I.      Factual Allegations

        A.      **The Retail Installment Sales Contract**

        On or about July 25, 2020, Plaintiff "entered into a Retail Installment Sales Contract ['RISC'] with Earnhardt Lexus in Phoenix, Arizona, to finance a used 2016 Toyota Corolla

with approximately 65,079 miles." (Doc. 9 ¶ 35.)[1] "The total amount financed under the agreement was $13,967.24, with an annual percentage rate (APR) of 26.25%. The loan was structured for repayment over 72 months in fixed monthly installments of $390.97." (*Id.* ¶ 36.) The RISC "reflected a total scheduled repayment amount of $28,149.84 over the full term." (*Id.* ¶ 37.) "Immediately upon execution, the [RISC] was assigned to [Exeter], who assumed the role of creditor and servicer for all purposes related to the account." (*Id.* ¶ 38.) "Between July 2020 and 2023, [Plaintiff] made 47 monthly payments totaling $19,905.89 toward the account." (*Id.* ¶ 39.)

The RISC contains an arbitration provision ("the Arbitration Provision"). (Doc. 20 at 8.) The Arbitration Provision appears in a separate box from other provisions of the RISC and is titled, in bold letters, "**ARBITRATION PROVISION PLEASE REVIEW – IMPORTANT – AFFECTS YOUR LEGAL RIGHTS**." (*Id.*) The Arbitration Provision provides:

> **1. EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY ARBITRATION AND NOT IN COURT OR BY JURY TRIAL.**
>
> **2. IF A DISPUTE IS ARBITRATED, YOU WILL GIVE UP YOUR RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE OR CLASS MEMBER ON ANY CLASS CLAIM YOU MAY HAVE AGAINST US INCLUDING ANY RIGHT TO CLASS ARBITRATION OR ANY CONSOLIDATION OF INDIVIDUAL ARBITRATIONS.**
>
> **3. DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.**
>
> Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this Arbitration Provision, and the

---

[1] Plaintiff submitted a declaration, including exhibits, in support of the complaint. (Doc. 14.) Plaintiff states that Exhibit A to that declaration is a "true and correct" copy of the RISC. (*Id.* at 2.) However, Exhibit A appears to be an incomplete copy of the RISC that omits the arbitration provision at issue here. (*Id.* at 8-10.) Defendants' declaration in support of their motion to compel arbitration attaches what appears to be a complete version of the RISC that includes the arbitration provision. (Doc. 20 at 5-9.) Plaintiff does not dispute the authenticity of the complete RISC provided by Defendants. When referring to the RISC throughout this order, the Court therefore relies on the complete RISC provided by Defendants. (*Id.*)

arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, purchase or condition of this vehicle, this contract or any resulting transaction or relation, (including any such relationship with third parties who do not sign this contract) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. If federal law provides that a claim or dispute is not subject to binding arbitration, this Arbitration Provision shall not apply to such claim or dispute. Any claim or dispute is to be arbitrated by a single arbitrator on an individual basis and not as a class action. You expressly waive any right you may have to arbitrate a class action. You may choose the American Arbitration Association (www.adr.org) or any other organization to conduct the arbitration subject to our approval. You may get a copy of the rules of an arbitration organization by contacting the organization or visiting its website.

Arbitrators shall be attorneys or retired judges and shall be selected pursuant to the applicable rules. The arbitrator shall apply governing substantive law and the applicable statute of limitations. The arbitration hearing shall be conducted in the federal district in which you reside unless the Seller Creditor is a party to the claim or dispute, in which case the hearing will be held in the federal district where this contract was executed. We will pay your filing, administration, service or case management fee and your arbitrator or hearing fee all up to a maximum of $5000, unless the law or the rules of the chosen arbitration organization require us to pay more. The amount we pay may be reimbursed in whole or in part by decision of the arbitrator if the arbitrator finds that any of your claims is frivolous under applicable law. Each party shall be responsible for its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law. If the chosen arbitration organization's rules conflict with this Arbitration Provision, then the provisions of this Arbitration Provision shall control. Any arbitration under this Arbitration Provision shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) and not by any state law concerning arbitration. Any award by the arbitrator shall be in writing and will be final and binding on all parties, subject to any limited right to appeal under the Federal Arbitration Act.

You and we retain the right to seek remedies in small claims court for disputes or claims within that court's jurisdiction, unless such action is transferred, removed or appealed to a different court. Neither you nor we waive the right to arbitrate by using self-help remedies, such as repossession, or by filing an action to recover the vehicle, to recover a deficiency balance, or for individual injunctive relief. Any court having jurisdiction may enter judgment on the arbitrator's award. This Arbitration Provision shall survive any termination, payoff or transfer of this contract. If any part of this

Arbitration Provision, other than waivers of class action rights, is deemed or found to be unenforceable for any reason, the remainder shall remain enforceable.  If a waiver of class action rights is deemed or found to be unenforceable for any reason in a case in which class action allegations have been made, the remainer of this Arbitration Provision shall be unenforceable.

*Id.*

### B.    The Repossession And Deficiency Notices

In or about October 2023, "Defendants conducted a nonjudicial repossession of [Plaintiff's] vehicle." (Doc. 9 ¶ 40.)  On or about November 21, 2023, the vehicle was sold at auction.  (*Id.* ¶ 45.)  Thereafter, "Defendants issued a post-sale 'Deficiency Letter' dated November 28, 2023" and "claimed a deficiency balance of $8,599.72."  (*Id.* ¶¶ 41, 43.) The complaint proceeds to allege several deficiencies with the repossession of Plaintiff's vehicle, the sale of Plaintiff's vehicle, and the deficiency notices provided to Plaintiff.

### C.    The Settlement Agreement

In October 2024, Plaintiff and Exeter "executed a written settlement agreement" ("Settlement Agreement").  (*Id.* ¶ 46.  *See also* Doc. 14 at 12-15; Doc. 20 at 11-14.) Plaintiff alleges that she executed the Settlement Agreement "under extreme financial duress, induced by Defendants' unlawful conduct and deliberate suppression of material disclosures required under federal and state law." (Doc. 9 ¶ 46.)  Plaintiff alleges that the Settlement Agreement "was presented in a coercive and deceptive manner, following an unlawful repossession and facially defective post-sale notices," and she asserts that the Settlement Agreement "is void and unenforceable under established doctrines of fraudulent inducement, lack of consideration, and unconscionability, and reflects a broader pattern of abusive conduct." (*Id.*)  Plaintiff also alleges that the RISC "was nullified, superseded, or rendered unenforceable by statutory violations, fraud in the inducement, and the execution of [the Settlement Agreement]." (*Id.* ¶ 16.)  Per the Settlement Agreement, Plaintiff "remitted $650." (*Id.* ¶ 47.)

The Settlement Agreement contains two provisions, excerpted here, that are relevant to Defendants' motion to compel arbitration:

The Parties agree that except as expressly provided in this [Settlement] Agreement, all other terms contained within the original [RISC], including without limitation those relating to Exeter's security interest in and lien on the Vehicle, shall survive and are incorporated by reference into the terms of this [Settlement] Agreement.

(Doc. 20 at 11 § I.A.iii.)

Customer(s) will comply with the Settlement Payment Terms set forth above and all other [RISC] terms that are not impacted by this [Settlement] Agreement.

(*Id.* at 12 § I.B.ii.)

### D.    The IRS Form 1099-C And Credit Reporting Issues

In November 2024, Plaintiff "received an IRS Form 1099-C stating that $5,374.43 had been canceled." (Doc. 9 ¶ 51. *See also* Doc. 14 at 17.) The IRS Form 1099-C was issued by Cobra, not Exeter. (Doc. 9 ¶ 51.) The complaint alleges that "Cobra is the parent company of co-Defendant Exeter" and that Cobra "affirmatively exercised creditor authority over Plaintiff's account." (*Id.* ¶ 21.) The complaint alleges various issues with Cobra's issuance of the IRS Form 1099-C.

Plaintiff further alleges that "[d]espite issuing the IRS Form 1099-C in November 2024 . . . Defendants continued to furnish false, derogatory, and legally inconsistent information to consumer reporting agencies" and "failed to update the tradeline to reflect the debt as canceled or settled in full." (*Id.* ¶ 58.) Plaintiff "submitted formal disputes to all three major credit bureaus, including Equifax, TransUnion, and Experian, demanding deletion or correction of the materially false tradelines. . . .  Despite this, Defendants accessed [Plaintiff's] credit report in June 2025 . . . and unilaterally altered negative account data during [the pending] litigation—without notifying [Plaintiff] in writing." (*Id.* ¶ 61.)

### E.    Plaintiff's Formal Demands And CFPB Complaint

On or about April 24, 2025, Plaintiff "served a formal legal demand letter to both Exeter and Cobra outlining their violations and providing a final opportunity to correct

their conduct." (*Id.* ¶ 63. *See also* Doc. 14 at 34.)[2] Plaintiff alleges that despite this formal demand, Exeter continued updating the tradeline with derogatory remarks. (Doc. 9 ¶¶ 64-66.)

On April 26, 2025, Plaintiff "filed a formal complaint with the Consumer Financial Protection Bureau (CFPB) against Exeter," to which Exeter responded. (*Id.* ¶ 81. *See also* Doc. 14 at 41-43.)

Plaintiff "issued a second legal notice on April 29, 2025, styled as a final 48-hour demand letter." (Doc. 9 ¶ 78.) On May 5, 2025, Exeter responded with a "non-substantive acknowledgement email from its 'Office of the President.'" (*Id.* ¶ 79. *See also* Doc. 14 at 26.) Plaintiff "promptly replied to the acknowledgement, reiterating [her] concerns, yet ha[s] received no further communication or substantive resolution from Exeter." (Doc. 9 ¶ 79.)

### F.   **The Alleged Harm**

Plaintiff alleges that "[a]s a direct result of Defendants' continued reporting of false, derogatory, and misleading information, [Plaintiff was] denied vehicle financing on more than thirty (20) separate occasions." (*Id.* ¶ 68.) "Each denial specifically cited the presence of the Exeter tradeline . . . ." (*Id.*) As a result, Plaintiff "lost access to over $500,000 in cumulative vehicle financing opportunities." (*Id.* ¶ 70.) Plaintiff has also been "forced to rent a vehicle continuously since November 2024," and she has "incurred more than $15,000 in vehicle rental expenses" and "continue[s] to suffer ongoing emotional distress, reputational harm, and material financial instability." (*Id.* ¶¶ 71-72.)

## II.   Procedural History

On June 13, 2025, Plaintiff filed the complaint. (Doc. 9.) That same day, Plaintiff also filed, among other things, an application to proceed *in forma pauperis* and an emergency motion for temporary injunctive relief. (Docs. 10, 11.)

On June 30, 2025, the Court issued an order that, among other things, granted

---

[2] Exhibit H to Plaintiff's declaration purports to be a copy of Plaintiff's demand letter, but the exhibit appears to be incomplete. (Doc. 14 at 34.)

Plaintiff's motion to proceed *in forma pauperis* and denied Plaintiff's motion for temporary injunctive relief.  (Doc. 15.)  The Court also screened the complaint pursuant to 28 U.S.C. § 1915(e) and held that the complaint was "sufficient to meet the low threshold for proceeding past the screening stage."  (*Id.* at 2, citation omitted.)

On September 19, 2025, Defendants moved to compel arbitration and stay the litigation pending arbitration.  (Doc. 19.)  That motion is now fully briefed (Docs. 21-23) and neither side requested oral argument.

**DISCUSSION**

I.    <u>Legal Standard</u>

The Federal Arbitration ("FAA") applies to contracts "evidencing a transaction involving commerce."  9 U.S.C. § 2.[3]  Under the FAA, written agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  *Id.*  Thus, absent a valid contractual defense, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."  *Dean Witter Reynolds, Inc., v. Byrd*, 470 U.S. 213, 218 (1985).

In general, a district court's role under the FAA is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue."  *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).  These two issues are sometimes referred to as the "gateway" questions of arbitrability.  *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010).

As the parties seeking to compel arbitration, Defendants bear the burden of proof. *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015).  "It is permissible to consider evidence outside the pleadings when resolving a motion to compel

---

[3]    The parties do not dispute that the FAA applies here.  (Doc. 19 at 6-7; Doc. 21 at 1. *See also* Doc. 20 at 8 [The Arbitration Provision in the RISC provides: "Any arbitration under this Arbitration Provision shall be governed by the [FAA] (9 U.S.C. § 1 et seq.) and not by any state law concerning arbitration."].)

arbitration.  To the extent there are conflicts in the evidence submitted by the parties, the court applies a standard similar to that applicable for a motion for summary judgment." *Scott-Ortiz v. CBRE Inc.*, 501 F. Supp. 3d 717, 721 (D. Ariz. 2020) (cleaned up).

"In determining whether parties have agreed to arbitrate a dispute, we apply general state-law principles of contract interpretation, while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration."  *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1044 (9th Cir. 2009) (cleaned up).  *See also Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1093 (9th Cir. 2014).

II.      The Parties' Arguments

Defendants "move to compel arbitration of [Plaintiff's] claims and stay the litigation pending completion of the arbitration."  (Doc. 19 at 1.)  First, Defendants argue that although the two gateway questions are normally "answered by the Court," "where, as here, an arbitration agreement expressly delegates to an arbitrator the decision concerning the enforceability and scope of the arbitration agreement, the arbitrator—not the court—has exclusive authority to determine these issues."  (*Id.* at 7.)  Defendants argue that "[h]ere, the Arbitration Provision in the RISC contains a clear and unmistakable delegation clause, stating that the arbitrator, and not a court, must resolve any dispute concerning 'the interpretation and scope of this Arbitration Provision, and the arbitrability of the claim or dispute.'"  (*Id.* at 8.)  Defendants also argue, in the alternative, that "even absent the delegation clause, the result is the same: Plaintiff is required to arbitrate her claims against Defendants."  (*Id.*)  Specifically, Defendants argue that "it is undeniable that Plaintiff expressly agreed to arbitrate her claims with Defendants" because "the Arbitration Provision is highlighted with a text box, bolding and all caps on a page that Plaintiff expressly signed," "[t]he Arbitration Provision is further referenced on the first and last pages of the RISC," and "the RISC title announces that it is a contract 'with Arbitration Provision.'"  (*Id.* at 8-9.)  Defendants also argue that "Plaintiff reaffirmed the entire RISC—including her agreement to arbitrate—when she entered into the Settlement Agreement" because the Settlement Agreement provides that the "terms contained within

the original [RISC] . . . shall survive and are incorporated by reference into the terms of this [Settlement] Agreement." (*Id.*)  And Defendants argue that Plaintiff's claims are encompassed by the "exceptionally broad" Arbitration Provision. (*Id.* at 9-10.)  Second, Defendants argue that Plaintiff's claims against Cobra are also subject to arbitration because "the Arbitration Provision expressly applies not only to claims arising out of the RISC itself, but to 'any resulting transaction or relationship (including any such relationship with third parties).'" (*Id.* at 10-11.)  Alternatively, Defendants argue that Plaintiff's claims against Cobra are subject to arbitration under the doctrine of alternative estoppel. (*Id.* at 11-13.)

In response, Plaintiff first argues that the fully integrated Settlement Agreement supersedes the RISC and that the Settlement Agreement "contains no arbitration clause, no delegation provision, and no incorporation of any prior arbitration term." (Doc. 21 at 1.) Plaintiff argues that under Supreme Court precedent, "it is for this Court, not an arbitrator, to determine which contract governs and whether arbitration may be compelled." (*Id.*) Plaintiff also contends that, in the Settlement Agreement, Defendants "preserved lien rights in precise language but deliberately omitted arbitration." (*Id.* at 2.)  Second, Plaintiff argues that "[e]ven if—hypothetically—the prior arbitration clause had survived, it includes a federal-law carve-out: 'If federal law provides that a claim or dispute is not subject to binding arbitration, this arbitration provision shall not apply.'" (*Id.* at 8.) Plaintiff argues that this carve-out applies here because her "claims under the FDCPA, FCRA, and TILA . . . arise under federal law, and the arbitration clause itself acknowledges that those claims are not subject to binding arbitration." (*Id.*)[4]  Third, Plaintiff argues that

---

[4]     Plaintiff argues that her "claims are based exclusively on violations of federal law." (Doc. 21 at 14.)  This is inaccurate.  The complaint an array of claims under state law, including Count Three – Violation of Arizona Uniform Commercial Code (Doc. 9 ¶¶ 106-17); Count Four – Breach of Contract and Fraudulent Inducement (*id.* ¶¶ 118-29); Count Six – Violation of Arizona Consumer Fraud Act (*id.* ¶¶ 139-48); Count Seven – Unjust Enrichment and Equitable Restitution (*id.* ¶¶ 149-56); Count Nine – Declaratory Relief: Settlement Agreement Is Void for Lack of Consideration and Failure of Performance (*id.* ¶¶ 167-75); Count Ten – Violation of Arizona Credit Reporting Law (*id.* ¶¶ 176-84); Count Eleven – Common Law Fraud / Intentional Misrepresentation (*id.* ¶¶ 185-93); Count Twelve – Promissory Estoppel (*id.* ¶¶ 194-201); Count Thirteen – Declaratory Relief: Tradeline Is Legally Void and Misleading (*id.* ¶¶ 202-08); Count Fourteen – Breach of the Covenant of Good Faith and Fair Dealing (*id.* ¶¶ 209-19); and Count Fifteen – Negligent

even if the RISC and its Arbitration Provision controls, § 4 of the FAA contains a "condition precedent to any order compelling arbitration" that "requires a movant to show that arbitration was 'refused' before seeking judicial compulsion," and "Defendants never satisfied the threshold requirement of FAA § 4" because "[t]hey did not serve a written demand to arbitrate, did not notify Plaintiff of any election to arbitrate, did not initiate or identify any arbitral forum, did not contact AAA or any administrator, and did not provide Plaintiff any opportunity to accept or reject arbitration before filing this Motion." (*Id.* at 2-3.) Fourth, Plaintiff argues that even if the Court were to find that the RISC's Arbitration Provision applies, "it would remain unenforceable" because it "is structurally incoherent, procedurally ambiguous, and substantively unconscionable." (*Id.* at 9.) For example, Plaintiff argues that the Arbitration Provision "vaguely provides that 'you or we may choose arbitration,' with no mandatory trigger, no opt-in deadline, no procedural roadmap, and no identifiable arbitral forum unless unilaterally approved by the stronger party" and "preserves only Exter's self-help and litigation rights." (*Id.*) Plaintiff argues that "[c]ourts interpreting such clauses routinely find them unconscionable, void for vagueness, or both." (*Id.*) Fifth, Plaintiff argues that "[g]ateway issues of arbitrability—including existence, formation, scope, and enforceability—are for the Court to decide, not arbitrators, unless delegation is 'clear and unmistakable,'" and she argues that there is no delegation here and/or that the delegation language in the Arbitration Provision "is not an enforceable delegation clause under federal law." (*Id.* at 5.) Sixth, Plaintiff argues that because her "present lawsuit arises from conduct that occurred entirely after execution of the Settlement Agreement and in violation of its terms," her claims "all . . . fall outside the scope of any prior agreement." (*Id.* at 10, 16.) Seventh, Plaintiff argues that "[p]ublic policy, equity, and Article III of the U.S. Constitution weigh heavily against allowing Defendants to sidestep judicial review." (*Id.* at 15.) Last, Plaintiff argues that "arbitration rights—like any contractual right—may be waived by conduct inconsistent with an intent to arbitrate" and that "Defendants' silence in the face of [Plaintiff's] demand letters, [her] CFPB

Misrepresentation (Common Law – Arizona) (*id.* ¶¶ 220-27).

complaint, and their receipt of formal service—followed by months of litigation conduct before ever mentioning arbitration—is textbook waiver." (*Id.* at 4.)[5]

In reply, Defendants dispute Plaintiff's "conten[tion] that there is no delegation clause," arguing that "the Arbitration Provision includes an explicit, unmistakable and unambiguous delegation clause." (Doc. 23 at 2.) Defendants also dispute Plaintiff's "conten[tion] that the delegation clause is contradictory," arguing that "if a party elects arbitration, the arbitration is mandatory." (*Id.*) Defendants argue that because the delegation clause is valid, "[a]lthough Plaintiff asserts various defenses to arbitration, these remaining defenses are to the Arbitration Provision generally, not the delegation clause specifically." (*Id.* at 3 n.3.) Defendants next argue that "[a]lthough mooted by the delegation clause, none of Plaintiff's remaining challenges to arbitration are valid in any event." (*Id.* at 3.) Specifically, Defendants argue that § 4 of the FAA "does not include such a notice, demand and refusal requirement." (*Id.*) And Defendants argue that "even if there was such a notice and rejection requirement (there is not), and even if there was no delegation clause (there is), Plaintiff's procedural challenge to arbitration based on an imaginary condition precedent must be resolved by an arbitrator." (*Id.* at 4.) Next, Defendants argue that they did not waive their right to arbitration because their deadline to respond to the complaint was September 19, 2025, and "[o]n that day Defendants filed their Motion." (*Id.* at 5.) Defendants further argue that their failure to seek to compel arbitration in response to Plaintiff's "written demands and CFPB complaint" are "pre-litigation

---

[5]    Plaintiff is proceeding *pro se*, but she still "must follow the same rules of procedure that govern other litigants." *Ghadimi v. Ariz. Bank & Tr.*, 2025 WL 2928933, *4 (D. Ariz. 2025) (quoting *King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1987), *overruled on other grounds by Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012)). The Court notes that for at least two cases cited in Plaintiff's opposition—*Anderson v. Dean Witter Reynolds, Inc.*, 306 F.3d 726 (9th Cir. 2002), and *Chavez v. Bank of Am.*, 2014 WL 2159382 (D. Ariz. 2014)—the citation provided does not return the case identified. Furthermore, Plaintiff's opposition misattributes apparently fake quotations to real cases. (*See, e.g.*, Doc. 21 at 12, citing *Matterhorn, Inc. v. NCR Corp.*, 763 F.2d 866, 868 (7th Cir. 1985)). "It appears the incorrect citations may be the result of [Plaintiff] using artificial intelligence to draft [her] filings." *Ghadimi*, 2025 WL 2928933 at *4. "But whether [Plaintiff] used artificial intelligence or simply imagined the cases [her]self, filing documents that contain such cases results in confusion and unnecessary work for opposing parties and the court. In the future, filing documents with fictitious cases will subject [Plaintiff] to sanctions under Rule 11." *Id.*

conduct that cannot form the basis of waiver." (*Id.* at 6.)  Defendants also dispute Plaintiff's argument that her claims are subject to a "federal-law carve-out" in the Arbitration Provision. (*Id.* at 6-7.)  Next, Defendants argue that the "Settlement Agreement does not supersede the Arbitration Provision."  (*Id.* at 7, cleaned up.)  Specifically, Defendants argue that Plaintiff "ignores the fact that she expressly incorporated by reference the RISC into the Settlement Agreement." (*Id.*)  Furthermore, Defendants argue that the Arbitration Provision, by its own terms, "expressly survives the termination of the RISC in any event." (*Id.* at 8.)  Defendants then dispute Plaintiff's arguments that the Arbitration Provision is unconscionable. (*Id.* at 9-11.)  Specifically, Defendants argue that "there is no ambiguity in the Arbitration provision," "there is no unconscionable carve out for self-help repossession or collection remedies," and "the Arbitration Provision expressly provides for governing rules, forum and procedure." (*Id.* at 10.)  Last, Defendants argue that Plaintiff's "last ditch effort" to invoke public policy fails because "the FAA 'reflects an emphatic federal policy in favor of arbitral dispute resolution.'" (*Id.* at 11, citation omitted.)

III.     Analysis

A.     **Contract Formation And Delegation Clause**

As noted, a district court's role under the FAA is generally "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp.*, 207 F.3d at 1130.  Furthermore, "[a]lthough these questions are ordinarily resolved by the court, parties may agree to arbitrate one or both of the gateway issues by including a delegation clause in the arbitration agreement." *Williams v. Experian Info. Sols. Inc.*, 2024 WL 3876171, *11 (D. Ariz. 2024).  "An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Rent-A-Center*, 561 U.S. at 70.  The evidence of the parties' intent to delegate such issues must be "clear and unmistakable." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).

Even if an arbitration provision includes a clause delegating gateway issues to the arbitrator, certain issues remain non-delegable and must be decided by the court. *Williams*, 2024 WL 3876171 at \*11. For example, "contract-*formation* issues are always matters for judicial resolution . . . even in the presence of a delegation clause." *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022). The Ninth Circuit has held that there are three guiding "principles" to assist in determining who—the district court or the arbitrator—should decide certain issues:

> First, a court must resolve any challenge that an agreement to arbitrate was never formed, even in the presence of a delegation clause. Next, a court must also resolve any challenge directed specifically to the enforceability of the delegation clause before compelling arbitration of any remaining gateway issues of arbitrability. Finally, if the parties did form an agreement to arbitrate containing an enforceable delegation clause, all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first instance.

*Id.*

### 1.    The First *Caremark* Principle

Beginning with the first of these principles, Plaintiff does not appear to argue that an arbitration agreement (or the RISC or Settlement Agreement) was never *formed*. At most, Plaintiff makes the conclusory argument in her response brief that she "specifically challenge[s] the *enforceability* of the arbitration clause—not just the contract overall." (Doc. 21 at 5. *See also id.* at 7 ["Plaintiff specifically challenges the arbitration clause itself, not merely the broader contract."].) But Plaintiff does not argue in her response brief, for example, that there was no "offer, acceptance, consideration, a sufficiently specific statement of the parties' obligations, [or] mutual assent" with respect to the Arbitration Provision in the RISC. *Buckholtz v. Buckholtz*, 435 P.3d 1032, 1035 (Ariz. Ct. App. 2019) (citation omitted).[6] True, the complaint alleges that the RISC "is unenforceable due to statutory violations, fraud in the inducement, lack of consideration, and procedural

---

[6]    Because the parties' briefs do not directly address which state's law governs the issue of contract formation but generally cite Arizona caselaw, the Court assumes that Arizona law applies.

irregularities." (Doc. 9 ¶ 13. *See also, e.g.*, *id.* ¶¶ 16, 49.) The complaint also alleges that the Settlement Agreement "is void and unenforceable under established doctrines of fraudulent inducement, lack of consideration, and unconscionability." (*Id.* ¶ 46. *See also, e.g.*, *id.* ¶¶ 47, 49, 113, 116, 123, 124, 128.) But as an initial matter, Plaintiff's allegations that the RISC and Settlement Agreement "lack consideration"—which would be a question of contract formation—are conclusory, lack any factual support, and are belied by the agreements themselves. Plaintiff's remaining challenges (at least as identified in the complaint) appear to be directed at the validity and enforceability of the RISC and Settlement Agreement contracts generally, not the Arbitration Provision itself. *Caremark*, 43 F.4th at 1029 ("In general, courts may resolve challenges *directed specifically to the validity of the arbitration provision itself*. If there is no such challenge—or if such a challenge fails—the court must send to the arbitrator any other challenges, including challenges to the validity of the contract as a whole. For instance, in the presence of an otherwise-valid arbitration provision, a challenge that the entire agreement was fraudulently induced or that the illegality of one of the contract's provisions renders the whole contract invalid must be sent to the arbitrator.") (cleaned up, emphasis added).

Nevertheless, Plaintiff also argues that the RISC (including its Arbitration Provision) was superseded by the Settlement Agreement and that "it is for this Court, not an arbitrator, to determine which contract governs." (Doc. 21 at 1.) Whether the Settlement Agreement superseded the RISC is not a gateway question subject to delegation. Instead, it "is effectively a 'contract-*formation* issue[],' and such issues are 'always matters for judicial resolution.'" *Williams*, 2024 WL 3876171 at \*15 (quoting *Caremark*, 43 F.4th at 1030). *See also id.* at \*17 ("[A] dispute over whether an earlier version of a contract has been superseded by a later version . . . is best conceptualized as a non-delegable question of contract formation."). In a nutshell, Plaintiff argues that the Settlement Agreement superseded the RISC, and because the Settlement Agreement was "integrated" and "contains no arbitration clause," the "omission" of such an arbitration provision from the Settlement Agreement is "binding." (Doc. 21 at 7-8.)

- 14 -

Plaintiff's argument is unavailing. The RISC, including its Arbitration Provision, is expressly incorporated by reference into the Settlement Agreement. Section I.A.iii of the Settlement Agreement provides:

> The Parties agree that except as expressly provided in this [Settlement] Agreement, all other terms contained within the original [RISC], including without limitation those relating to Exeter's security interest in and lien on the Vehicle, shall survive and are incorporated by reference into the terms of this [Settlement] Agreement.

(Doc. 20 at 11.)[7] Under § I.A.iii, the terms of the RISC are expressly incorporated by reference into the Settlement Agreement unless "expressly provided" otherwise in the Settlement Agreement. That requirement is not satisfied here—both sides agree that the Settlement Agreement is silent regarding arbitration. Thus, the RISC's Arbitration Provision is incorporated by reference into the Settlement Agreement.

In an attempt to avoid this conclusion, Plaintiff's emphasizes that "Defendants preserved their lien rights with precision but elected not to preserve any arbitration clause." (Doc. 21 at 8.) But § I.A.iii provides that "all other terms contained within the original [RISC], *including without limitation* those relating to Exeter's security interest in and lien on the Vehicle, shall survive and are incorporated by reference." (Doc. 20 at 11.) The use of the phrase "including without limitation" forecloses Plaintiff's argument.

Nor is there any merit to Plaintiff's argument that "[t]his case presents precisely the contractual conflict identified by the Supreme Court in" *Coinbase, Inc. v. Suski*, 602 U.S. 143 (2024). (Doc. 21 at 1.) In *Coinbase*, "[t]he parties . . . executed two contracts. The first contained an arbitration provision with a delegation clause; per that provision, an arbitrator must decide all disputes under the contract, including whether a given disagreement is arbitrable. The second contract contained a forum selection clause, providing that all disputes related to that contract must be decided in California courts."

---

[7] Section I.B.ii also provides that "Customer(s) will comply with the Settlement Payment Terms set forth above *and all other [RISC] terms* that are not impacted by this [Settlement] Agreement." (Doc. 20 at 12, emphasis added.) Because nothing in the Settlement Agreement "impacts" the RISC's Arbitration Provision, the Settlement Agreement does not extinguish the RISC's Arbitration Provision.

*Coinbase*, 602 U.S. at 145. The question presented was: "When two such contracts exist, who decides the arbitrability of a contract-related dispute between the parties—an arbitrator or the court?" *Id.* The Supreme Court held that the "court needs to decide . . . which contract controls." *Id.* Although *Coinbase* answers the question of *who* (i.e., the Court) determines whether a subsequent agreement supersedes a prior agreement containing an arbitration provision, *Coinbase* does not answer the second (related) question of *whether* a subsequent agreement (i.e., the Settlement Agreement) that incorporates by reference a prior agreement containing an arbitration provision (i.e., the RISC) extinguishes the arbitration provision in the prior agreement. Indeed, *Coinbase* is factually distinguishable from this case because, there, the subsequent agreement contained a forum selection clause explicitly calling for disputes to be decided in California courts, directly contradicting the prior agreement's arbitration provision. In contrast, the Settlement Agreement is silent on dispute resolution and incorporates all terms from the prior RISC unless expressly contradicted by the Settlement Agreement.

In answering *whether* the Settlement Agreement incorporates by reference the Arbitration Provision of the RISC, the Court finds *Weatherguard Roofing Co. v. D.R. Ward Const. Co.*, 152 P.3d 1227 (Ariz. Ct. App. 2007), instructive. There, Ward entered into a "prime contract" to construct a home for the Gaskins. *Id.* at 1228. Ward also entered into subcontracts with Weatherguard for certain aspects of the project. *Id.* Following completion of the project, the Gaskins served a demand for arbitration on Ward seeking damages for construction defects. *Id.* Ward, in turn, demanded arbitration with the subcontractors (including Weatherguard) to indemnify him for claims arising from the subcontractors' work. *Id.* Weatherguard opposed the arbitration demand, arguing that (1) "it was not contractually obligated to arbitrate Ward's indemnity claim" because the general conditions—which provided for indemnity—"never became part of its subcontract with Ward"; (2) "even if the general conditions became part of the subcontract, the general conditions did not incorporate by reference, and thus did not bind Weatherguard to, the arbitration provision in the prime contract"; and (3) "because the subcontract contained

- 16 -

express provisions governing arbitration, which Ward admitted did not require Weatherguard to arbitrate Ward's indemnity claim, these 'more specific' provisions controlled the 'more general' arbitration provision in the prime contract." *Id.* at 1229. The Arizona Court of Appeals "disagree[d] with each argument." *Id.*

As for Weatherguard's first argument, the court held that "it is a basic rule of contract construction that to incorporate by reference: The reference must be *clear and unequivocal* and must be called to the attention of the other party, he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties." *Id.* (cleaned up). The court held that because the subcontract contained the language "The attached General Conditions are part of the subcontract," "[t]his statement made clear that the separate general conditions were part of the subcontract." *Id.* The same is true here—§ I.A.iii of the Settlement Agreement clearly and unequivocally provides that "except as expressly provided in" the Settlement Agreement, the terms of the RISC "shall survive and are incorporated by reference into the terms of" the Settlement Agreement. (Doc. 20 at 11.)

As for Weatherguard's second argument, the court rejected the notion "that an arbitration provision in one agreement cannot be incorporated by reference into another agreement absent a specific reference to arbitration." *Weatherguard Roofing*, 152 P.3d at 1231. The court held that "contrary to Weatherguard's argument, no specific word or phrase—such as a specific reference to arbitration—is required." *Id.* Here, although § I.A.iii does not expressly identify the Arbitration Provision as one of the terms of the RISC being incorporated by reference into the Settlement Agreement, § I.A.iii is nevertheless clear that "except as provided in this [Settlement] Agreement, *all other terms* contained within the original [RISC] . . . shall survive and are incorporated by reference." (Doc. 20 at 11, emphasis added.)

As for Weatherguard's third argument, the court held that the references to litigation in the subcontract did not preclude arbitration. *Weatherguard Roofing*, 152 P.3d at 1233. Plaintiff appears to make a similar argument. Pointing to § XII of the Settlement

Agreement, Plaintiff argues that this section "reaffirms that litigation was fully contemplated" and contends that "Courts have repeatedly held that such language does not create a binding arbitration clause." (Doc. 21 at 8.) But the only purported case Plaintiff cites in support of her position—*Anderson v. Dean Witter Reynolds, Inc.*, 306 F.3d 726, 740 (9th Cir. 2003)—appears to be a hallucinated citation. At any rate, Plaintiff's argument is at odds with *Weatherguard*.

Finally, although the analysis could end there, the Arbitration Provision in the RISC also provides: "This Arbitration Provision shall survive any termination, payoff or transfer of this contract." (Doc. 20 at 8.) Therefore, even if the Settlement Agreement did not incorporate by reference the terms of the RISC (it did), Plaintiff has failed to provide any explanation as to how or why the Settlement Agreement extinguishes the RISC's Arbitration Provision in light of this clause providing for its survival.

In sum, as for *Caremark*'s first principle, an agreement to arbitrate was formed.

### 2.    The Second *Caremark* Principle

*Caremark*'s second principle is that "a court must also resolve any challenge directed specifically to the enforceability of the delegation clause before compelling arbitration of any remaining gateway issues of arbitrability." *Caremark*, 43 F.4th at 1030. As noted, the evidence of the parties' intent to delegate gateway issues of arbitrability must be "clear and unmistakable." *Brennan*, 796 F.3d at 1130.

One of Plaintiff's arguments appears to be that the Arbitration Provision in the RISC lacks a delegation clause. (*See, e.g.*, Doc. 21 at 2, emphasis added ["Where—as here—there is no valid or enforceable agreement governing the claims asserted, *no delegation of arbitrability*, and no procedural compliance with the FAA, the Motion must be denied in full."]; *id.* at 5 ["No Delegation Exists Here"]; *id.* at 6 ["That is not a delegation clause. . . . In fact, the clause never once mentions the words 'delegate,' 'delegation,' 'exclusive authority,' or anything resembling language that would shift gateway decisions to an arbitrator."]; *id.* at 7 ["Even if a delegation clause existed (it does not) . . . ."].) Any such argument is without merit. By expressly agreeing that "the interpretation and scope of this

Arbitration Provision, and the arbitrability of the claim or dispute . . . shall . . . be resolved by neutral, binding arbitration and not by a court action" (Doc. 20 at 8), the parties provided "clear and unmistakable" evidence of their intent to arbitrate arbitrability. *See, e.g.*, *Adams v. Conn Appliances Inc.*, 2017 WL 3315204, *2-3 (D. Ariz. 2017) (where arbitration provision explicitly provided that it "[c]overs *any dispute concerning the arbitrability* of any such controversy or claim," holding that "[t]he Supreme Court and this Circuit repeatedly have concluded that similar delegation language is sufficiently clear and unmistakable evidence that the parties intended to arbitrate questions of arbitrability").

Equally meritless is Plaintiff's argument that no delegation clause was formed because the Arbitration Provision does "no[t] reference . . . AAA Rule 7 or JAMS Rule 11" or any other "institutional rules that confer gateway authority." (Doc. 21 at 6.) True, the Ninth Circuit has held that "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Brennan*, 796 F.3d at 1130. The Ninth Circuit has also held that "[i]ncorporation of the JAMS arbitration rules by reference constitutes clear and unmistakable evidence that the parties agree to arbitrate arbitrability." *Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 481 (9th Cir. 2024). But Plaintiff has not cited, nor has the Court located, any case suggesting that the incorporation of such institutional rules is a prerequisite to the formation of a delegation clause. Nor would such a rule make sense—incorporating AAA and/or JAMS rules may be one way of evincing clear intent to arbitrate arbitrability, but it is not the only way. Indeed, in *Sedbrook v. Select Asset Recovery Grp., LLC*, 2025 WL 1023994 (D. Ariz. 2025), the court held that an arbitration provision with language identical to the one in the RISC "clearly and unmistakably delegates the question of arbitrability to the arbitrator." *Id.* at *2.[8] *See also Jacksen v. Chapman Scottsdale Autoplex, LLC*, 2021 WL 3410912, *1,

---

[8] Defendants argue, and Plaintiff does not appear to dispute, that Plaintiff's claims against Cobra, a non-signatory, are also subject to arbitration to the extent Plaintiff's claims against Exeter are subject to arbitration. (Doc. 19 at 10-13; Doc. 23 at 2 n.2.) At any rate, at issue in *Sedbrook* was an arbitration provision with language identical to the Arbitration Provision in the RISC. *Sedbrook*, 2025 WL 1023994 at *2. There, "[t]he parties disagree[d] on whether Defendants as nonsignatories may invoke the arbitration clause against Plaintiff, a signatory." *Id.* The court held that this was a "question[] of arbitrability

5 (D. Ariz. 2021) (holding that a similar contractual arbitration provision "clearly and unmistakably delegates gateway issues to the arbitrator"); *Johnson v. Santander Consumer USA Inc.*, 2015 WL 7567483, *1-2 (D. Ariz. 2015) (same).

Of course, "[e]ven if the delegation of arbitrability is clear and unmistakable, the provision may be unenforceable if the delegation provision itself is unconscionable." *Drake v. Conn's HomePlus*, 2019 WL 2568841, *2 (D. Ariz. 2019) (citing *Rent-A-Center*, 561 U.S. at 71-74). "When a court finds that the parties unmistakably delegated the question of arbitrability to the arbitrator, then 'the only remaining question is whether the particular agreement to *delegate* arbitrability—the Delegation Provision—is itself unconscionable.'" *Id.* (quoting *Brennan*, 796 F.3d at 1132). "However, if the whole agreement is challenged on unconscionability grounds, rather than the delegation provision specifically, 'the question of whether the agreement, as a whole, is unconscionable must be referred to the arbitrator.'" *Id.* (quoting *Nagrampa v. Mailcoups, Inc.*, 469 F.3d 1257, 1263-64 (9th Cir. 2006)).

Here, Plaintiff argues that "[t]he *arbitration language* is structurally incoherent, procedurally ambiguous, and substantively unconscionable. It vaguely provides that 'you or we may choose arbitration,' with no mandatory trigger, no opt-in deadline, no procedural roadmap, and no identifiable arbitral forum unless unilaterally approved by the stronger party. It preserves only Exeter's self-help and litigation rights—including repossession and court enforcement—while denying the consumer any mutual escape. Courts interpreting such clauses routinely find them unconscionable, void for vagueness, or both." (Doc. 21 at 9, emphasis added. *See also id.* at 16, emphasis added ["*[T]he 2020 arbitration clause* is procedurally and substantively unconscionable under both FAA§ 2 and Arizona law. The clause is riddled with ambiguity ('you or we may choose arbitration'), offers carveouts solely in Defendants' favor (repossession, collection, litigation), and fails to designate any governing rules, forum, or procedure. It lacks mutuality, fails for vagueness, and is unenforceable as a matter of public policy."].)

the Contract clearly delegates to the arbitrator." *Id.* The same is true here.

The problem for Plaintiff is that many of these unconscionability arguments appear to challenge the RISC's Arbitration Provision generally, not the delegation clause specifically. "[A] challenge to the validity of an entire arbitration agreement—[including] an unconscionability challenge—must be decided by the arbitrator if the agreement includes a delegation clause that is not directly challenged. . . . [A] party must challenge[] the delegation provision specifically for a court to intervene." *Caremark*, 43 F.4th at 1029 (cleaned up). In *Bielski v. Coinbase, Inc.*, 87 F.4th 1003 (9th Cir. 2023), the Ninth Circuit identified two principles to determine what a plaintiff must do to sufficiently challenge a delegation provision specifically: "First, a party resisting arbitration must mention that it is challenging the delegation provision and make specific arguments attacking the provision in its opposition to a motion to compel arbitration. Second, a party may challenge the delegation provision and the arbitration agreement for the same reasons, so long as the party specifies why each reason renders the specific provision unenforceable." *Id.* at 1009-10.

It's a close call whether Plaintiff's arguments can be said to challenge the delegation clause specifically as opposed to the Arbitration Provision generally. On the one hand, Plaintiff specifies several times that her unconscionability arguments are directed at "[t]he arbitration language" (Doc. 21 at 9) and at "the 2020 arbitration clause" (*id.* at 16). Indeed, Plaintiff states in her opposition: "I specifically challenge the enforceability *of the arbitration clause.*" (*Id.* at 5, emphasis added. *See also id.* at 7, emphasis added ["Plaintiff specifically challenges *the arbitration clause itself* . . . ."].) On the other hand, Plaintiff's opposition does mention the delegation clause and argues that it "is not an enforceable delegation clause under federal law." (*Id.* at 5.) Plaintiff also argues, for example, that the Arbitration Provision is "internally contradictory" because it does not "unambiguously vest authority over arbitrability with an arbitrator." (*Id.*) And Plaintiff argues that "Defendants' attempt to cast this convoluted and contingent clause as a clear delegation is not only legally incorrect—it is deceptive." (*Id.* at 7.)

In an abundance of caution, and in light of her *pro se* status, the Court will assume

that Plaintiff has sufficiently challenged the enforceability of the delegation clause specifically. Even so, her arguments regarding unconscionability and unenforceability are without merit. For example, Plaintiff argues that the phrase "shall . . . be resolved by arbitration . . . at your or our election" is "internally contradictory" because the use of "shall" "signals an imperative" but "at your or our election" "renders it conditional." (Doc. 21 at 5. *See also id.* at 9 ["It vaguely provides that 'you or we may choose arbitration,' with no mandatory trigger, no opt-in deadline, no procedural roadmap, and no identifiable arbitral forum unless unilaterally approved by the stronger party."].) But these phrases are not contradictory or confusing. Under the Arbitration Provision, either party may elect to resolve a dispute by arbitration, and if either party so elects, arbitration (with delegation of arbitrability to the arbitrators) is mandatory. Furthermore, Plaintiff may choose the AAA or other rules to govern the arbitration, and her choice of governing rules is subject to Exeter's approval. It's unclear what Plaintiff means when she refers to the lack of an "opt-in deadline" or "procedural roadmap"; regardless, the Arbitration Provision provides extensive guidance regarding the procedure to be followed in choosing the arbitrator, the allocation of fees for the arbitration, and the forum in which the arbitration should take place. (Doc. 20 at 8.) This language is not so vague or confusing as to render the delegation clause ambiguous or unenforceable.

As for Plaintiff's argument that the Arbitration Provision is one-sided because it "preserves only Exeter's self-help and litigation rights—including repossession and court enforcement—while denying the consumer any mutual escape" (Doc. 21 at 9), that argument—to the extent it can even be seen as targeted toward the delegation clause specifically, as opposed to the Arbitration Provision generally—is unavailing. *See, e.g.*, *Jones v. Gen. Motors Corp.*, 640 F. Supp. 2d 1124, 1134-35 (D. Ariz. 2009) (arbitration agreement not unconscionable where it contained self-help provision, specifically for repossession, which the plaintiff argued benefited only the defendant).

As for Plaintiff's argument that the Arbitration Provision is unconscionable because it "fails to designate any governing rules, forum, or procedure" (Doc. 21 at 16), that is

simply untrue.  The Arbitration Provision provides that Plaintiff may choose the AAA or other rules to govern the arbitration, subject to Exeter's approval.  (Doc. 20 at 8.)  It provides that the arbitrator must be an attorney or retired judge selected pursuant to the chosen arbitral organization's rules.  (*Id.*)  It also provides that "[t]he arbitrator shall apply the governing substantive law and the applicable statute of limitations.  The arbitration hearing shall be conducted in the federal district in which [Plaintiff] reside[s] unless the Seller Creditor is a party to the claim or dispute, in which case the hearing will be held in the federal district where [the RISC] was executed."  (*Id.*)  It also provides for how costs will be distributed.  (*Id.*)

Nor do Plaintiff's undeveloped references to "[p]ublic policy, equity, and Article III of the U.S. Constitution" (Doc. 21 at 15) support a finding of unconscionability, particularly as applied to the delegation clause specifically.  The policy behind the FAA supports "direct[ing] the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."  *Dean Witter Reynolds*, 470 U.S. at 218.  Accordingly, Plaintiff has not shown the delegation clause in the Arbitration Provision is unconscionable or unenforceable.[9]

### 2.    The Third *Caremark* Principle

*Caremark*'s third and final principle is that "if the parties did form an agreement to arbitrate containing an enforceable delegation clause, all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first instance."  *Caremark*, 43 F.4th at 1030.  Because the parties did form an agreement to arbitrate, which contained an enforceable delegation clause, Plaintiff's remaining arguments regarding the unconscionability of the Arbitration Provision, the RISC, or the Settlement Agreement are for the arbitrator to decide.

Several of Plaintiff's other arguments again raise questions for the arbitrator, not the

---

[9]    Plaintiff also appears to argue that because the delegation clause does not contain "clause-severability language that would isolate delegation from other provisions" (Doc. 21 at 6), that somehow renders the delegation clause unenforceable.  Plaintiff provides no support for this argument, and the Court is unaware of any authority supporting such an argument.

Court.  For example, Plaintiff argues at length that the Arbitration Provision "contains an express carve-out—which fatally undermines any claim of total or automatic applicability." (Doc. 21 at 6.)  Plaintiff points to language in the Arbitration Provision that provides: "If federal law provides that a claim or dispute is not subject to binding arbitration, this Arbitration Provision shall not apply to such claim or dispute." (*Id.*)  But whether Plaintiff's claims fall within this carve-out is a delegated question regarding the *scope* of the Arbitration Provision.  *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1076 (9th Cir. 2013).  Put another way, whether federal law provides that some or all of Plaintiff's claims are not subject to binding arbitration is an "arbitrability determination, which the parties have clearly and unmistakably delegated to the arbitrator." *Id.*

Likewise, Plaintiff argues that her claims "arise[] from conduct that occurred entirely after execution of the Settlement Agreement and in violation of its terms." (Doc. 21 at 10.)  But to the extent Plaintiff is attempting to argue that her claims are not subject to arbitration because they occurred post-settlement, that question, again, is one of scope that has been delegated to the arbitrator.

Plaintiff also argues at length that Defendants did not demand, and she did not refuse, arbitration, and she contends that § 4 of the FAA requires such a demand and refusal as a condition precedent to arbitration.  (Doc. 21 at 2-4.)  But even assuming for the sake of argument that Plaintiff's understanding of § 4 is correct, the question of Defendants' satisfaction of this condition precedent to arbitrability would be a question for the arbitrator to decide.  *Cf. Quantum Fluids LLC v. Kleen Concepts LLC*, 2021 WL 242104, *7 (D. Ariz. 2021) ("The Court need not decide whether Kleen satisfied, or should be excused from satisfying, all of the ADR Clause's prerequisites to arbitration (*i.e.*, engaging in at least three negotiation sessions and then engaging in mediation) because that issue has been delegated to the arbitrator to decide in the first instance.").  Indeed, even if the Arbitration Provision did not have an enforceable delegation clause, the satisfaction of a condition precedent to arbitrability would still be presumptively a question for the arbitrator.  *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 34-35 (2014) ("[C]ourts presume that the

- 24 -

parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration. . . .   And they include the satisfaction of 'prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate.'") (cleaned up).

B.   **Waiver**

As noted, Plaintiff argues that Defendants waived their right to arbitrate through their pre- and post-litigation conduct.  (Doc. 21 at 11-13.)  Specifically, Plaintiff argues that Defendants "were served by the U.S. Marshal and waited more than 60 days—without raising arbitration as an affirmative defense, without responding to [Plaintiff's] pre-litigation demands, and without initiating any arbitral forum—before filing this Motion." (*Id.* at 15-16.)

The first question that must be addressed is who decides whether Defendants have waived, through their litigation conduct, their right to arbitrate—the Court or the arbitrator?  The Ninth Circuit "ha[s] made clear that courts generally decide whether a party has waived his right to arbitration by litigation conduct.  If the parties intend that an arbitrator decide that issue under a particular contract, they must place clear and unmistakable language to that effect in the agreement." *Martin v. Yasuda*, 829 F.3d 1118, 1124 (9th Cir. 2016).  As discussed, the Arbitration Provision provides that "[a]ny claim or dispute, . . . including the *interpretation and scope* of this Arbitration Provision, and the *arbitrability* of the claim or dispute . . . shall . . . be resolved by neutral, binding arbitration." (Doc. 20 at 8, emphasis added.)  The Court concludes that this language does not provide clear and unmistakable evidence, sufficient to overcome the presumption of judicial resolution, of the parties' intent to have an arbitrator decide issues of waiver by litigation conduct.  *See, e.g.*, *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1209 & n.4 (9th Cir. 2016) (even where the "Agreements delegated to the arbitrators the authority to decide issues relating to the 'enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision,'" "[t]he arbitration agreements may not have clearly and unmistakably delegated to the arbitrator the authority to decide the question of waiver by

- 25 -

litigation conduct"); *Morgan Stanley & Co. LLC v. Couch*, 659 F. App'x 402, 404-05 (9th Cir. 2016) (concluding, where the arbitration clause provided that "any dispute as to the arbitrability of a particular issue or claim pursuant to this arbitration provision is to be resolved in arbitration," that "[t]his language, requiring that the arbitrability of individual *issues* or *claims* be resolved by the arbitrator, does not encompass disputes over whether the clause remains valid in light of the parties' litigation conduct" and that "[t]he arbitration clause is not clear and unmistakable evidence that the parties intended for an arbitrator to decide claims of waiver by litigation"); *In re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*, 143 F.4th 718, 723 (6th Cir. 2025) ("Here, although the clauses at issue broadly delegate to arbitration all disputes over the sales contracts' 'validity,' 'enforceability,' 'scope,' and 'arbitrability,' they do not cover gateway questions such as waiver through inconsistent litigation conduct. . . . [A]lthough the clauses do mention questions of 'arbitrability,' we believe that this lone reference falls well short of the clear and unmistakable language needed for FCA to overcome the presumption of judicial resolution.") (citations omitted); *Marie v. Allied Home Mortg. Corp.*, 402 F.3d 1, 15 (1st Cir. 2005) (concluding, where the arbitration agreement provided for the submission of claims and disputes to arbitration "*including the arbitrability of any such controversy or claim*," that the use of the term "arbitrability" did not "evince[] a clear and unmistakable intent to have waiver issues decided by the arbitrator" and thus "the question of waiver of Allied's right to arbitrate due to its participation in EEOC proceedings is properly for the judge").

Even so, Plaintiff's waiver argument fails on the merits. "A determination of whether the right to compel arbitration has been waived must be conducted in light of the strong federal policy favoring enforcement of arbitration agreements." *Martin*, 829 F.3d at 1124 (citation omitted). "Because waiver of the right to arbitration is disfavored, any party arguing waiver of arbitration bears a heavy burden of proof." *Id.* (citation omitted). "[T]he test for waiver of the right to compel arbitration consists of two elements: (1) knowledge of an existing right to compel arbitration; and (2) intentional acts inconsistent

with that existing right." *Hill v. Xerox Bus. Servs., LLC*, 59 F.4th 457, 468 (9th Cir. 2023).

The second element is not satisfied here. Although Plaintiff is correct that Defendants' "first act in this Court was to file a Motion to Compel Arbitration" (Doc. 21 at 12), this does not remotely qualify as action inconsistent with Defendants' right to arbitration. "[A] party acts inconsistently with exercising the right to arbitrate when it (1) makes an intentional decision not to move to compel arbitration and (2) actively litigates the merits of a case for a prolonged period of time in order to take advantage of being in court." *Martin v. TEKsystems Mgmt. Inc. (Fn)*, 2021 WL 2334389, *5 (D. Ariz. 2021) (quoting *Newirth by & through Newirth v. Aegis Senior Communities, LLC*, 931 F.3d 935, 941 (9th Cir. 2019)). On the same day that Defendants were required to answer the complaint, they moved to compel arbitration. There was no litigation activity by Defendants beforehand. This is the antithesis of the sort of conduct that might support a finding of waiver. *Cf. id.* ("Here, American Airlines only filed an answer to Plaintiff's complaint before filing the instant Motion to Compel Arbitration. Although the answer failed to assert the affirmative defense of arbitration, American has not actively litigated the merits of the case for a prolonged period of time and in fact has made an intentional decision to move to compel arbitration. Inlight of American's actions and the strong policy against finding a waiver of arbitration, this Court finds that American has not acted inconsistent with its right to arbitrate.").

As for Plaintiff's arguments regarding Defendants "ignor[ing] [Plaintiff's] multiple written demand letters and CFPB complaint" (Doc. 21 at 12), failing to make a pre-litigation demand for arbitration does not amount to waiver. After all, waiver "requires conduct inconsistent with the arbitration remedy," and passive pre-litigation inaction by a defendant who is merely being threatened with suit is not inconsistent with that remedy. *Okabayashi v. Travelers Home & Marine Ins. Co.*, 2015 WL 6447400, *3 (D. Ariz. 2015). *See also Specialty Merch. Corp. v. Navigators Ins. Co.*, 2012 WL 12892158, *3 (C.D. Cal. 2012) ("Plaintiffs nevertheless argue that Defendant had acted inconsistently with its arbitration right by failing to submit the dispute to arbitration during the approximately

twelve-month period leading up to the filing of this action, in which the Parties exchanged correspondence regarding the denial of Plaintiffs' claims. This argument is unavailing . . . . Plaintiffs offer no authority to support the proposition that a party's pre-litigation failure to invoke the right to arbitration alone could constitute a waiver.").[10]

C.   **Stay**

Defendants ask the Court to stay this action pending completion of the arbitration. (Doc. 19 at 13.) "When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024). Accordingly, Defendants' stay request is granted.

Accordingly,

**IT IS ORDERED** that:

1.   Defendants' motion to compel arbitration (Doc. 19) is **granted**.

2.   This action is **stayed**. Within 10 days of the conclusion of the arbitration proceeding, Defendants must file a status report.

Dated this 26th day of February, 2026.

_____
Dominic W. Lanza
United States District Judge

---

[10] The Court is also unpersuaded by Plaintiff's argument, handwritten on the exhibits to her declaration (Doc. 22 at 10), that by responding to Plaintiff's CFPB complaint and advising her to "request information and/or documentation in accordance with the civil procedure and local court rules associated with" the pending litigation, Defendants waived their right to arbitrate. *Cf. Specialty Merch. Corp.*, 2012 WL 12892158 at *3 ("The fact that Defendant also expressly advised Plaintiffs of their administrative remedy with the California Department of Insurance, as required by section 2695.7(b)(3) of the California Code of Regulations, is not inconsistent with Defendant's reservation of its rights under the Policy, including its right to arbitration.").